**UNITED STATES of America,**
**Appellee,**

v.

**Caesar BOTTONE, Seymour Salb, and**
**Nathan Sharff, Appellants.**

**No. 436, Docket 30343.**

United States Court of Appeals
Second Circuit.

Argued June 23, 1966.

Decided Aug. 4, 1966.

Certiorari Denied Dec. 5, 1966.
See 87 S.Ct. 514.

Moses Polakoff, New York City (Van Riper & Belmont, Newark, N. J., Walter D. Van Riper, Newark, N. J., of counsel; Theodore M. Wolkof, New York City, on the brief), for defendants-appellants Salb and Sharff.

Alfred Donati, Jr., New York City (Zoloto, Karger & Zurkow, New York City, Arthur Karger, New York City of counsel), for defendant-appellant Bottone.

Daniel R. Murdock, New York City (Robert M. Morgenthau, U. S. Atty., for S. D. New York; John S. Martin, Jr., Stephen F. Williams, John E. Sprizzo, Asst. U. S. Attys.), for the United States.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

The convictions here under appeal stem from a scheme for the massive extraction from Lederle Laboratories, a division of American Cyanamid Company located in Pearl River, N. Y., of microorganisms used in the production of three antibiotics and a steroid,[1] and instructions for the drugs' manufacture. Although the drugs were covered by patents and specimen cultures were required to be deposited in collections available for purchase by the public at minimal cost, improved strains of the microorganisms and detailed manufacturing processes developed by Lederle which were not in the public domain offered vastly greater output from the same physical plant. The combination of this with the lack of patent protection in certain foreign countries created a market for stolen cultures and secret processes and furnished a substantial incentive for theft to disloyal employees and persons willing to do business with them. The enterprise that was the subject of this indictment involved stealing and preserving cultures Lederle had developed, temporarily removing and copying documents that outlined manufacturing procedures, and then selling the cultures and the copies primarily for ultimate exportation to Europe. As in so many criminal trials, the Government's case was presented mainly through the chief culprits, two former Lederle employees, Sidney Fox and John Cancelarich, and their lieutenant, Leonard Fine, all of whom pleaded guilty to the charges against them and were rewarded for their cooperation with light sentences of six-months' imprisonment.[2] The serious crimes charged against the appellants, Salb, Sharff and Bottone, were on the receiving end.

The trial was in the District Court for the Southern District of New York before Judge Metzner and a jury. The counts submitted, on which appellants were found guilty and given two-year concurrent sentences, were in summary as follows:

| Number | Charge | Appellants |
|---|---|---|
| 1 | Transporting CTC cultures and related documents from Spring Valley, N. Y., to East Paterson, N. J., on November 11, 1959. | Salb Sharff |
| 8 | Transporting TC, CTC, DMCTC and triamcinolone cultures and related documents from New York to Rome, Italy, on April 16, 1961. | Bottone Salb Sharff |
| 9 | Transporting CTC culture from New York to Milan, Italy, on September 15, 1961. | Bottone Sharff |
| 10 | Conspiracy to steal, transport and sell cultures and related documents from March 1958 to July 1964. | Bottone Salb Sharff |

----

1. The antibiotics were tetracycline (TC), sold as Achromycin; chlortetracycline (CTC), sold as Aureomycin; and demethyl-chlortetracycline (DMCTC), sold as Declomycin. The steroid was triamcinolone, sold as Aristocort.

2. Joseph Gerace, a lesser accomplice, who also testified for the Government, received a suspended sentence.

Appellants' prolix briefs re-argue the evidence in a manner that would scarcely be convincing to a jury and is wholly misplaced before an appellate court. Counsel ought to understand the futility of tedious efforts to show that each piece of testimony is susceptible of an innocent interpretation if it stood alone. The trier is entitled, in fact bound, to consider the evidence as a whole; and, in law as in life, the effect of this generally is much greater than of the sum of the parts. Cf. United States v. Monica, 295 F.2d 400, 401–402 (2 Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962). Indeed we find simply frivolous the attempt to demonstrate insufficiency by Salb and Sharff, who, as proprietors of Biorganic Laboratories of East Paterson, N. J., had begun illicit dealings with Fox in stolen Lederle cultures as early as the winter of 1958, continued their purchases of microorganisms and documents for more than two years, and then switched their custom to Cancelarich after he had acquired most of Fox' collection of Lederle cultures and records. Although Bottone entered the conspiracy at a later stage and the Government adduced no direct testimony that he had heard the cultures and documents described as stolen from Lederle, the evidence of his participation in discussions as to disposition of the goods and of his substantial role in facilitating transportation abroad of both cultures and participants, which we summarize in the margin,[3] amply met the Government's burden. To hold that the jury could not be convinced from all this evidence of his comings and goings that Bottone knew what was about, would re-

3. Bottone's first significant appearance was in June 1960 when Sharff and Salb were endeavoring to persuade Fox it would be dangerous for him to sell the stolen materials by himself. They placed a fake advertisement seeking information in a trade paper under the name of a Dr. Angelo Mancuso, with the address of Sharff's brother-in-law. Fox answered the ad and met in London with a business associate of Bottone, Salvetti, who masqueraded as Dr. Mancuso. Salvetti telephoned Bottone who was then in Italy and, saying he had just met with a group that had closed a big deal which he had to stop, asked Bottone to cable him in London that Interpol was investigating the theft of Lederle trade secrets. Bottone sent the cable, left for London in the middle of the night, and secretly observed Salvetti show the cable to Fox. Afterwards Salvetti told Bottone he wanted to stop Fox' deal so that he might offer the same information and microorganisms at a lower price. In March 1961 Bottone had a visit in Berlin with Wawretschek, head of a Milan pharmaceutical firm, Ankermann, which had been a purchaser of the stolen cultures and processes; Wawretschek complained about the quality of the microorganisms and suggested a new deal whereby Salb, Sharff, Salvetti and Bottone would buy into his company. Bottone telephoned this proposal to Salvetti in Rome; on April 10 the American group executed a purchase contract in New Jersey, with Salvetti signing in Bottone's behalf. On April 14 Fine and Salvetti drove Cancelarich from Salvetti's apartment in Bronxville, N. Y., to Biorganic to discuss Cancelarich's employment at Ankermann with Salb, Sharff and Bottone. Cancelarich made a full revelation of his own thieveries and his possession of Fox' collection of Lederle cultures and processes, but it was not proved that this was heard by Bottone, who arrived late. Two days later Bottone drove Cancelarich from Fort Lee, N. J., to Kennedy Airport and bought him a ticket to Italy; Cancelarich carried stolen cultures and papers describing Lederle's processes. Bottone subsequently flew to Milan and in May introduced Cancelarich to a Dr. Marpurgo, representing a Milan firm called MIBA, who was interested in buying a DMCTC process. Cancelarich promised to furnish this for $60,000, which he agreed to split with Bottone who said he would split his share with Salvetti. The culture and processes furnished MIBA were stolen from Lederle. Somewhat later Bottone drove Fine, equipped with stolen Lederle cultures and documents destined for Ankermann, from New Jersey to Kennedy Airport and bought him a ticket to Italy. Fine and Marpurgo subsequently reported to Bottone MIBA's success with the processes supplied by Cancelarich. In July Bottone financed a trip to Italy for Fine whom he asked to collect $2,000 of his share from Marpurgo. Finally, in September 1961 Bottone, at Sharff's request, took a CTC culture from New York to Milan for delivery to Wawretschek, telling him that the package contained strains coming from Fine.

quire a greater degree of credulity than even such "naif, simple-minded men" as appellate judges, see Holmes, Collected Legal Papers 295 (1920), can be expected to possess. And we are wholly unimpressed by the criticisms now made of the judge's summary of this evidence, to which counsel took no exception at the time. See United States v. Kahaner, 317 F.2d 459, 478–479, 482 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed. 2d 65 (1963).

The only serious point of law raised by appellants is whether the transportation of papers describing the Lederle processes constituted the transportation in interstate or foreign commerce of "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. The problem is not any doubt on our part that papers describing manufacturing procedures are goods, wares, or merchandise, as was held with respect to geophysical maps in United States v. Seagraves, 265 F.2d 876 (3 Cir. 1959), and United States v. Lester, 282 F.2d 750 (3 Cir. 1960), cert. denied, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961). Neither do we have any concern over the value of these papers, since we dismiss out of hand the contentions that secret processes for which European drug manufacturers were willing to pay five and six figures and in whose illicit exploitation appellants eagerly invested a large portion of their time and an appreciable amount of their fortunes were not worth the $5,000 required to subject them to federal prosecution, see United States v. Schaffer, 266 F.2d 435, 440 (2 Cir. 1959), aff'd, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed. 2d 921 (1960), or that the judge committed any prejudicial error in his submission of that issue to the jury. If Abbott v. United States, 239 F.2d 310, 312–313 (5 Cir. 1956) is to be considered as ruling out evidence of value in a thieves' market, we prefer the contrary Third Circuit holdings in United States v. Seagraves, supra, 265 F.2d at 880, and United States v. Lester, supra, 282

F.2d at 754–755. The serious question is whether, on the facts of this case, the papers showing Lederle processes that were transported in interstate or foreign commerce were "goods" which had been "stolen, converted or taken by fraud" in view of the lack of proof that any of the physical materials so transported came from Lederle's possession. The standard procedure was for Fox and Cancelarich to remove documents from Lederle's files at Pearl River, N. Y., take these to Fox' home within New York state, make photocopies, microfilms or notes, and then restore the purloined papers to the files; only the copies and notes moved or were intended to move in interstate or foreign commerce. The case differs in this respect from the Third Circuit cases of *Seagraves* and *Lester* where, as the records on appeal show, the photostats and tracings delivered by the Gulf Oil geologist were the property of the company, having been made in the company's office, on its paper and with its equipment.

We are not persuaded, however, that a different result should obtain simply because the intangible information that was the purpose of the theft was transformed and embodied in a different physical object. To be sure, where no tangible objects were ever taken or transported, a court would be hard pressed to conclude that "goods" had been stolen and transported within the meaning of § 2314; the statute would presumably not extend to the case where a carefully guarded secret formula was memorized, carried away in the recesses of a thievish mind and placed in writing only after a boundary had been crossed. The situation, however, is quite different where tangible goods are stolen and transported and the only obstacle to condemnation is a clever intermediate transcription or use of a photocopy machine. In such a case, when the physical form of the stolen goods is secondary in every respect to the matter recorded in them, the transformation of the information in the stolen papers into a tangible object never possessed by the original owner should

be deemed immaterial. It would offend common sense to hold that these defendants fall outside the statute simply because, in efforts to avoid detection, their confederates were at pains to restore the original papers to Lederle's files and transport only copies or notes, although an oversight would have brought them within it. We have been instructed to "free our minds from the notion that criminal statutes must be construed by some artificial and conventional rule." United States v. Dege, 364 U.S. 51, 52, 80 S.Ct. 1589, 1590, 4 L.Ed.2d 1563 (1960) (Frankfurter, J.), quoting United States v. Union Supply Co., 215 U.S. 50, 55, 30 S.Ct. 15, 54 L.Ed. 87 (1909) (Holmes, J.). See also United States v. Sullivan, 332 U.S. 689, 693–694, 68 S.Ct. 331, 92 L.Ed. 297 (1948); United States v. Bramblett, 348 U.S. 503, 509–510, 75 S. Ct. 504, 99 L.Ed. 594 (1955); United States v. Turley, 352 U.S. 407, 412–413, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Such considerations have particular force when, as here, the defendants could not have doubted the criminal nature of their conduct, and the sole issue is whether they subjected themselves to punishment by the United States as well as by a state.

 Alternatively, we accept the Government's suggestion that the judgment may stand even if the statute does not reach far enough to include the copies and notes. Each count included and the evidence showed the transportation of cultures which were stolen "goods" on any view. The problem whether the copies and notes of Lederle documents were also within the statute arises only because substantive counts 1 and 8 and conspiracy count 10 charged the transportation both of cultures and of documents and the jury made no finding that the cultures alone were worth $5,000, although it would have been quite justified in doing so. But, says the Government, count 9 charged only transportation of a stolen CTC culture which the jury necessarily found worth the statutory minimum in convicting Sharff and Bottone and in view of the concurrent sentences we need not go further as to them. And Salb's conviction should also stand since the transportation of the culture charged in count 9 was in furtherance of the conspiracy alleged in count 10 and the journey was one of the overt acts. In accepting this argument here we would not wish to be understood as giving all-out obeisance to the validation of concurrent sentences by the presence of one or more good counts, see Lawn v. United States, 355 U.S. 339, 359–362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); despite frequent reliance on this principle where appropriate, we adhere to Judge Clark's statement that we will reverse for a material error on another count "whenever the nature of the error committed below or other circumstances suggest that the accused might have received a longer sentence than otherwise would have been imposed, or that he has been prejudiced by the results of the proceedings." United States v. Hines, 256 F.2d 561, 563 (2 Cir. 1958); cf. United States v. Barash, 365 F.2d 395 (2 Cir. 1966). But this is not such a case. The error—if there was one—went only to including the papers in the determination of value under counts 1, 8 and, by reference, the conspiracy count, and, as said in United States v. Schaffer, supra, 266 F.2d at 440:

> "The only reason for the $5,000 limitation is to avoid overtaxing the Department of Justice. There is no legitimate interest of [defendants] * * * which the Congress sought to protect by this requirement."

We have not the slightest question that the jury would have properly convicted on all counts if only the transportation of cultures had been charged, and the papers had been relied on simply as demonstrating the scope of the criminal enterprise and as enhancing the value of the microorganisms. Judge Metzner's remarks on imposing sentence show that he viewed defendants' activities as a whole, and the two-year concurrent sentences were modest as compared to the permitted maximum of ten years imprisonment, a $10,000 fine, or both, on

each substantive count, 18 U.S.C. § 2314, or the five years imprisonment, $10,000 fine or both, on the conspiracy count, 18 U.S.C. § 371.

The only other point meriting discussion, and that somewhat questionably, is Bottone's objection to the Government's being allowed to use a deposition and a memorandum of further interrogation in a civil action. Merck & Co. had obtained a consent judgment of $100,000 in the District Court for New Jersey against Bottone for infringement of its patent on Vitamin B–12. In May 1962 it entered into an agreement, amended a month later, whereby it would accept $15,000 in satisfaction of the judgment if Bottone would give a "frank and complete disclosure in depositions under oath of all matters and things" within his knowledge on a specified list of subjects. Bottone claims that government investigation had "focused" upon him before the bulk of the interrogation, see Escobedo v. State of Illinois, 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), that his answers were extracted by pressure and subterfuge on the part of Merck's New Jersey attorney who also represented American Cyanamid in that state and that much of the interrogation was conducted without Bottone's counsel being present. Therefore, he insists, use of his answers at trial should have been barred as in violation of Fifth and Sixth Amendment rights, or that at least he should have been given a hearing to prove that Merck's lawyer was acting in part at the Government's behest.

Putting to one side the Government's substantial claims that these points were not sufficiently raised below, we find them wholly without merit. In no conceivable way was Bottone "compelled * * * to be a witness against himself." He freely consented to the interrogation, for his own benefit, to rid himself of a liability for $85,000; if the questioning touched on matters tending to incriminate him, he was free to claim the privilege on penalty only of foregoing the financial advantages that performing his agreement to talk would entail.

Since he was not in custody, the rules laid down in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have no application even if Merck's attorney were working with the Government—quite apart from this having been a pre-Miranda trial. See Johnson v. State of New Jersey, 384 U.S. 719, (1966). In any event, not only is it fairly inferable that Bottone had the advice of counsel when he signed the agreement with Merck but a lawyer was present during half the civil interrogation and there was nothing to prevent one from assisting throughout if Bottone had wished. Moreover, in contrast to Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), no "criminal prosecution" against Bottone had been commenced at the time of the questioning, and *Miranda* appears to teach that the references in Escobedo v. State of Illinois, supra, to the need for counsel in the period prior to initiation of the criminal process were solely concerned with the need for a lawyer to counteract the coercion thought to be inherent in in-custody interrogation.

Affirmed.