UNITED STATES of America, Plaintiff,

v.

Paul A. LAMBERT, Defendant.

Crim. No. N–77–98.

United States District Court,
D. Connecticut.

Feb. 3, 1978.

892

Richard N. Blumenthal, U. S. Atty. for the District of Conn., New Haven, Conn. Asst. U. S. Attys., Michael J. Hartmere and Lawrence M. Herrmann, for plaintiff.

Peter I. J. Davis and Charles Norman Shaffer, Rockville, Md., for defendant.

## RULING ON MOTION TO DISMISS

DALY, District Judge.

Defendants have been charged in an indictment with violating 18 U.S.C. § 641 (1970),[1] a statute which establishes sanctions upon any person who "embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States . . . ." The indictment alleges that the defendants sold information derived from a computer within the Drug Enforcement Administration, Washington, D. C. The information allegedly included the identity of possible informants and the status of government investigations into illegal drug traffic. Because only information rather than documents was transferred, defendant Lambert claims that

§ 641 is inapplicable. Furthermore, if § 641 is found to apply, the defendant argues that the statute is unconstitutionally vague and overbroad.

## SECTION 641: INFORMATION AS A "THING OF VALUE"

Defendant's specific contention is that the phrase "any record, voucher, money, or thing of value of the United States" encompasses only tangible objects, e. g., a document embodying information rather than the information itself. Defendants point to the legislative history for support. The section appeared originally in the 1948 Revision, which recodified but did not alter the substantive offenses in the U. S. Code. Therefore, the Court must first look to the section's legislative history prior to the 1948 revision.

Section 641 is a condensation of at least four sections in the 1940 Code, 18 U.S.C. §§ 82, 87, 100, 101. Section 82 referred to the larceny of "any property" of the government, or "any property which has been or is being made, manufactured, or constructed under contract." Section 87 referred to the theft of "any ordinance, arms, ammunition, clothing, subsistence, stores, money, or other property of the United States." Clearly, these sections refer to tangible goods. Sections 100 and 101, however, both referred to "money, property, record, voucher, or valuable thing whatever, of the money, goods, chattels, records, or property of the United States." Thus the mention of a "record . . . or thing of value" in § 641 can be traced to these two broadly worded sections, the language of which contrasts sharply with the more con-

---

1. 18 U.S.C. § 641 (1970) provides:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or

gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

crete references of §§ 82 and 87. Sections 100 and 101, in turn, descended from two sections of the 1909 codification, Act of March 4, 1909, ch. 321, §§ 47, 48, 35 Stat. 1097, 1098. The relevant phrasing in these latter sections is identical to the wording of the 1940 Code, as is the language of their predecessors, Act of March 3, 1875, ch. 144, §§ 1, 2, 18 Stat. 479.

Because the relevant statutory language has traveled through more than a century without substantive change, there is little recent legislative history to illuminate Congress' intent. In addition, the Congressional debates of 1875 fail to delineate the scope of the statutory language. Defendants therefore argue that the use of the word "record" in statutes contemporaneous with or prior to the original statute of 1875 should be examined. The defendants point to statutes dealing with the theft of court records, §§ 5394, 5403, 5408, (Rev.Stat. 1875); Act of February 26, 1853, § 4, 10 Stat. 170; Act of 1790 § 15, 1 Stat. 115, as proof that Congress meant to refer only to government documents, rather than to mere information as well when legislating in 1875. This "matrix of judicial meaning", as the defendant calls it, is far too selective, and fails to account for the open-ended phrase "thing of value" in § 641 and its predecessors. This phrase evidences Congress' intent to cover a wide variety of conduct. However, the Court does not consider the legislative history conclusive as to the applicability of § 641 to the specific conduct alleged in this case. Further guidance must be sought from judicial interpretations of that section.

It has been contended that the transfer of mere information does not constitute a violation of § 641, because traditional tort law does not encompass such conduct. A similar conclusion was reached by the Ninth Circuit in the case of *Chappell v. United States,* 270 F.2d 274 (9th Cir. 1959), the continuing validity of which is in doubt.[2]

In that decision, the Court of Appeals dismissed part of an indictment because the defendant's conduct did not constitute conversion under § 641. The defendant, a Master Sergeant in the U. S. Air Force, utilized an airman's labor while on duty to paint several apartments owned by the defendant. In the court's view, § 641 was merely a codification of common-law offenses, and under tort law conversion could only be performed upon tangible goods. As a result, the court termed the application of § 641 to the misappropriation of an employee's labor a "revolutionary concept", and invoked the need for strict construction of criminal statutes in finding § 641 inapplicable to the defendant's conduct. *Id.* at 278.[3]

This court sees no reason to restrict the meaning of § 641 to its common-law origins. In *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the Supreme Court interpreted § 641 as requiring a criminal intent, although the statute as worded did not explicitly refer to such a mental state. The respondents had argued that to "knowingly convert" did not require the same mental state as did the other common-law offenses listed in the statute. The Court rejected such a close equivalence between the statutory provision and earlier case law. In discussing the history of § 641, the Court concluded that the section applied to "acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *Id.* at 269, n.28, 72 S.Ct. at 253. The relevant statutory predecessor to § 641 was similarly described by the Fifth Circuit in *Crabb v. Zerbst,* 99 F.2d 562, 565 (5th Cir. 1938), as covering "larceny, as well as any new situation which may arise under changing modern conditions and not envisioned under the common-law . . . ." In particular, the Court of Appeals was concerned with the difficult relationship between common-law

---

2. *See United States v. Friedman,* 445 F.2d 1076 (9th Cir. 1971), discussed later in this opinion.

3. Prior to the *Chappell* decision, the Sixth Circuit had applied § 641 to virtually identical

facts without considering a "tangibility" limitation. *See Burnett v. United States,* 222 F.2d 426 (6th Cir. 1955).

crimes, whose borders were indistinct, and the statutory language. Between the common-law offenses of embezzlement and larceny, the court wrote, "lies a gap which has grown wider and wider as the multifarious activities of the central government have spread and increased." *Id.* To fill this gap, Congress included the word "steal," a word "having no common law definition to restrict its meaning as an offense, and commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another, and deprives the owner of the rights and benefits of ownership . . . ." *Id.* A more flexible interpretation of § 641 than that found in *Chappell* is therefore appropriate.

In *United States v. Bottone,* 365 F.2d 389 (2d Cir.), *cert. denied,* 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966), the Court of Appeals interpreted a statute prohibiting the interstate transportation of "any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud." 18 U.S.C. § 2314. The defendants had removed from corporate offices, *inter alia,* documents detailing a valuable organic chemical process. The documents were copied at another location and notes were made. Then the originals were returned. Only the copies and notes travelled through interstate commerce. The issue was whether the copies and notes were "goods" within the meaning of the statute. The court concluded that the copies and notes were included within the definition of "goods", reasoning that "where the physical form of the stolen goods is secondary in every respect to the matter recorded in them, the transformation of the information in the stolen papers into a tangible object never possessed by the original owner should be deemed immaterial."[4] *Id.* at 393–94.

Other courts have noted with approval the *Bottone* court's emphasis on the content of government documents, rather than their form. The district court in *United States v. Rosner,* 352 F.Supp. 915 (S.D.N.Y.1972), contrasted § 641 to 18 U.S.C. § 2071. The defendants were charged with removing certain papers, including Grand Jury minutes, from the files of the U. S. Attorney's Office in the Southern District of New York. The Government argued that it had been deprived of the full benefit of the temporarily removed documents in that the exclusivity of possession would have helped the prosecutor. *United States v. Bottone, supra,* was relied upon to overcome the fact that the documents themselves were returned unscathed after copies were made. Nevertheless, the court concluded that § 2071 did not apply because the documents were neither impaired nor destroyed. In dismissing the count brought under § 2071, the court noted that the Government would likely have met with greater success had the defendants been indicted for violating § 641, under which statute the transmission of the information contained in the documents might be considered as larcenous as the taking of the documents themselves. *Id.* at 922.

The most recent source of guidance as to the proper scope of § 641 is *United States v. DiGilio,* 538 F.2d 972 (3d Cir. 1976). In that case, the defendants were prosecuted for periodically copying FBI investigative records and selling them to the subject of the investigation. The Government contended that the deprivation of its exclusive possession of the contents of the investigative files was proscribed by § 641. The Third Circuit found such a conclusion unnecessary. Because copies were made during office time, with government machines, and on government paper, the court determined that the copies themselves were govern-

---

4. However, the Second Circuit also noted in dicta that § 2314 would "presumably not extend to the case where a carefully guarded secret formula was memorized, carried away in the recesses of a thievish mind and placed in writing only after a boundary had been crossed." *United States v. Bottone,* 365 F.2d 389, 393 (2d Cir. 1966). Thus the court indicated that the failure to reduce the information to writing might well have been a fatal flaw in a § 2314 prosecution. However, § 2314 includes narrower language than does § 641. The former provision refers to "goods", a statutory term clearly connoting tangibility.

ment property. The court cautioned that it "did not, by resting upon the narrower ground that a technical larceny has been proved, intend to imply a rejection of the government's broader interpretation of § 641." *Id.* at 978. The court also mentioned the apparent inconsistency between the Ninth Circuit's restrictive interpretation of § 641 in *United States v. Chappell, supra,* and the Supreme Court's discussion of that section's history in *Morissette v. United States, supra.* But the court declined to rule on the application of § 641 to the theft of information, as opposed to documents, otherwise held exclusively by the government. *Id.*[5]

The only decision in which § 641 was applied to the theft of government information was *United States v. Friedman,* 445 F.2d 1076 (9th Cir.), *cert. denied sub nom., Jacobs v. United States,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). The Government in that case alleged the transfer of secret Grand Jury transcripts in violation of § 641. The defendants were found guilty of copying portions of the transcripts without authority. In contrast to the situation in *United States v. DiGilio, supra,* the copies were made privately, therefore finding a technical larceny of government copying supplies was impossible. In the charge to the jury, the trial judge explained that under Rule 6(e) of the Federal Rules of Criminal Procedure the Grand Jury transcripts could not be released until authorized by the court. The judge then continued:

> The effect of said Rule is that information as to the questions asked and answers given at a particular session of the Grand Jury are the property of the United States and remain its property alone unless and until the release of said information is ordered by a court order. Said information is Government property regardless of who may be said to own the particular sheets of paper or tapes on which said information is recorded.

*Id.* at 1087. The Court of Appeals upheld this charge. However, the defendant's challenge to the trial judge's action was restricted to whether the charge removed the "authority" element from the jury's consideration.

■■■ This Court agrees with the approach of the trial judge in *United States v. Friedman, supra.* In order for § 641 to realize the broad-gauged role articulated by the Supreme Court in *Morissette v. United States, supra,* and suggested by the statutory phrase "thing of value", it must be independent of the constraints, and the vagaries, of particular common-law doctrines. As *United States v. Bottone, supra,* teaches us, the content of a document may be more important than its original four corners. In fact, the defendant himself admits that government documents have little value apart from the information contained in them. The Government's brief describes well the importance of the allegedly stolen information:

> The property involved here, highly sensitive and confidential information maintained in computerized records, had a value only so long as it remained in the Government's exclusive possession. While so possessed, it was . . . a thing of extraordinary, incalculable value, something gained by the expenditure of countless man hours and other resources, capable of saving lives or, if misappropriated, severely jeopardizing them.

This Court sees no reason to restrict the scope of § 641 to the theft of government paper and ink, or to unauthorized reproduction. The phrase "thing of value" in § 641, in conjunction with the explicit reference to "any record", covers the content of such a record.[6]

## VAGUENESS AS APPLIED

■■ Defendant Lambert argues that § 641 is unconstitutionally vague as applied

---

**5.** The Third Circuit mentioned that any prosecution for theft of government information, rather than of the documents themselves, would presumably rely on the "thing of value" language in § 641. *United States v. DiGilio,* 538 F.2d 972, 978 n.10 (3d Cir. 1976).

**6.** This Court does not mean to suggest by this holding that § 641 may cover the unauthorized oral transfer of government information not found in government records.

to him given the Court's interpretation of the statutory phrase "thing of value" to include information derived from government records. The Due Process Clause of the Fifth Amendment requires that the language of a statute be precise enough to provide notice of prohibited conduct. A statute written in "terms so vague that men of common intelligence must necessarily guess at its meaning, and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co.* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). *See Smith v. Goguen,* 415 U.S. 566, 572–74, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). The issue thus is whether a person of "common intelligence" would "necessarily" wonder if his contemplated conduct were illegal.

■■■ The language of the statute provides significant guidance. The reference to "any record" clearly includes information held in a government computer data bank. The phrase "other thing of value" strongly suggests that something other than the particular records themselves, *i. e.,* the contents, are probably covered as well. Indeed, the distinction between a government "record" and its contents is rather fine. The individual of common intelligence would probably include the information held in a government computer in the statutory term "record" without reference to the catch-all phrase "thing of value." Furthermore, an investigation as to whether a statute is so vague as to "trap the innocent by not providing fair warning", *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972), must consider not only the statutory language, but also judicial interpretations of the statute and analogous legislation, *id.* at 110, 92 S.Ct. 2294; *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). The judicial decisions discussed earlier constitute a supplemental form of notice that § 641 covers the conduct alleged in the indictment. This Court therefore holds that an individual planning the unauthorized sale of information held in a government data bank had sufficient notice that such conduct would be covered by § 641.

■■■ The Due Process doctrine of vagueness also requires that the terms of the statute be clear enough to prevent arbitrary and discriminatory enforcement by the prosecutor, the court, or the jury. *Smith v. Goguen, supra,* 415 U.S. at 572, 94 S.Ct. 1242; *United States v. Cohen Grocery,* 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921); *United States v. Reese,* 92 U.S. 214, 221, 23 L.Ed. 563 (1876). However, the present case is not an example of the Government's "unfettered discretion" in prosecuting on the basis of a statute so vague or of such broad applicability that "even handed administration of the law is not possible." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 168, 171, 92 S.Ct. 839, 848, 31 L.Ed.2d 110 (1972). Nor is it the task of the jury in this case to give meaning to the statutory phrase "thing of value." The interpretation of § 641 suggested by the statutory language, supported by case law, proposed by the Government, and endorsed by this Court, provides a "reasonably ascertainable standard of guilt." *Herndon v. Lowry,* 301 U.S. 242, 264, 57 S.Ct. 732, 742, 81 L.Ed. 1066 (1932).

## FIRST AMENDMENT JUS TERTII

Defendant Lambert argues that § 641 should be declared facially unconstitutional because it violates the First Amendment. The defendant does not allege interference with his own rights, and it is clear from the indictment that the alleged conduct was not constitutionally protected. Rather, he raises the claims of those not before this Court, as permitted by the First Amendment exception to the traditional rule of standing. *Contrast Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222

(1972), *with United States v. Raines*, 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *see also Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). This exception "is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972); *see Coates v. City of Cincinnati*, 402 U.S. 611, 619–20, 91 S.Ct. 1686, 29 L.Ed.2d 214 (White, J., dissenting). In particular, defendant claims that the blanket prohibition against unauthorized disclosures of government records and information is overbroad because it fails to indicate when disclosure is unauthorized, thus leaving to the jury the task of regulating the flow of information about government activity. The jury's freedom, the defendant continues, makes possible the punishment of constitutionally protected communication, and the prospect of such verdicts may deter those who might otherwise speak.[7]

Although the defendant challenges the statute for overbreadth, the statutory phrase "without authority" is also susceptible to attack for vagueness. In many cases, the doctrines of vagueness and overbreadth are distinguishable. The former, originally a due process doctrine, applies when the statutory language is unclear, and is concerned with notice to the potential wrongdoer and prevention of arbitrary or discriminatory enforcement. The doctrine of overbreadth, in contrast, is exclusively a First Amendment product, and usually applies when the statutory language is clear, but encompasses activities in which people have a right to engage without interference. However, in a suit challenging an ambiguously worded statute for infringing upon First Amendment rights, the doctrines blend. The same evils are addressed, *i. e.*, application of the statute's sanctions to protected activity and deterrence of others from engaging in similar conduct, and the same remedies are available, *i. e.*, a narrowing interpretation or facial invalidation. As a result, some courts have made no attempt to distinguish the two doctrines when measuring a statute against the requirements of the First Amendment. *See, e. g., Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Cox v. Louisiana*, 379 U.S. 536, 551, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965) (statute held "unconstitutionally vague in its overly broad scope"). Finally, both doctrines permit a court to invalidate a statute if one who has not participated in constitutionally protected activity can show that the discouragement of protected activity is "both real and substantial," and that the statute is not susceptible to a narrowing construction. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59–61, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (vagueness); *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (overbreadth).[8]

In *Broadrick*, the Supreme Court explained that facial invalidation of an overbroad statute would be justified if the statute's illegitimate sweep was "substantial" in relation to the statute's proper applications. *Id.* Other courts, however, have inverted the test and declared that a statute is valid on its face if the number of proper applications are "substantial." *See, e. g.*,

---

7. For a similar constitutional criticism of § 641, see Nimmer, *National Security Secrets v. Free Speech; The Issues Left Undecided in the Ellsberg Case*, 26 Stan.L.Rev. 311, 322–23 (1973).

8. In *Young*, the Supreme Court referred to these criteria as a test of standing. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59–61, 96 S.Ct. 2440, 49 L.Ed.2d 310; *see Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). But the test does not prevent a party from raising the First Amendment claims and it does not relieve a court from considering them. However, once the claims of third parties have been raised, the test places a heavy burden on the party seeking invalidation of the statute to show that the statute deserves to be declared void on its face. The test thus concerns the requirements for *successfully* asserting the right of third parties. Otherwise the distinction between standing and success on the merits would be lost.

*Arbeitman v. District Court of Vermont,* 522 F.2d 1031, 1034 (2d Cir. 1975); *Paulos v. Breier,* 507 F.2d 1383, 1386 (7th Cir. 1974). It is clear that the word "substantial" is no talisman. This Court considers a strictly quantitative interpretation of the *Broadrick* test inadvisable. Otherwise, a legislature could insulate large-scale interferences with First Amendment rights by embedding those restrictions in a regulatory framework of much broader applicability. The enormous variety of potential applications of the statute requires both the comparison of the government's interest in continuing to prohibit the non-protected activities covered by the statute with the First Amendment interest in avoiding the potential chill created by the statute, and the search for a judicial remedy designed to minimize the conflict.

Section 641 prohibits a large variety of possessory offenses. In relation to tangible items, the government's interest in preventing theft, and thus preserving its exclusive possession, is great. Equally important, the sweep of the statute is clear. Ownership of property is usually evident; at least an individual knows when property does not belong to him. Moreover, because property rights in tangible items are easily discerned, there is little confusion about when a transfer of possession is "without authority." In the realm of government records and information, however, there is no established common law of exclusive possession. In addition, the government's interest in secrecy must in every case be carefully balanced against the First Amendment interest in disclosure. Discussion of government affairs is the creative force of a pluralistic republic, and it constitutes the core activity protected by the First Amendment. *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Whitney v. California,* 274 U.S. 357, 375–76, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). "The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information. . . . [S]ecrecy in government is fundamentally anti-democratic, perpetu-

ating bureaucratic errors." *New York Times Co. v. United States,* 403 U.S. 713, 724–25, 91 S.Ct. 2140, 2146, 29 L.Ed.2d 822 (1971) (Douglas, J., concurring). In order for discussion to be "uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), information about the government must be available. Although the Constitution does not impose on governments an affirmative duty to disclose information, *T. Emerson, The System of Freedom of Expression* 673 (1970), it does prohibit interference with not only the right to disseminate information, but also the right to receive it. *See, e. g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (prescription drug prices); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 621 n. 5, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (door-to-door solicitation for political causes); *Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (mail from prisoner); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (contraceptive information); *cf. Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (FCC's equal-time rule). And the interests protected are not merely those of the speaker and the audience, but those of society as a whole. *See, e. g., Bates v. State Bar,* 433 U.S. 350, 364, 97 S.Ct. 2691, 2696, 53 L.Ed.2d 810 (1977). By regulating the disclosure of government information, § 641 clearly touches a sensitive constitutional area. Therefore the need for definiteness is acute. Yet § 641 provides no greater guidance as to when disclosure is prohibited than it does in regard to traditionally recognizable possessory interests. Indeed, the statutory phrase "without authority" is virtually devoid of meaning when applied to the transfer of information.

This lack of content in the phrase "without authority" makes application of the overbreadth test difficult, for an examination of the statute's sweep, both legitimate and illegitimate, largely depends on the

meaning of that phrase. The Court could interpret the phrase to mean "without express permission," but that would make illegal the disclosure of information of public interest that the government had no reason to keep secret, and had not meant to protect, but had merely overlooked. This would constitute a government pocket veto on disclosure unrelated to the significance of the information. The phrase also could mean, in the context of government employees, "only with the permission of one's superior." But this would punish subordinates who disclose information of public significance against the arbitrary orders of superiors who fear embarrassment. Numerous other interpretations are possible, and without guidance the jury would be free to construct its own test as to when disclosure of government information is punishable. Whether the problem with the statute is termed overbreadth or vagueness, it is clear that the statute is susceptible to impermissible applications.

 This Court considers substantial both the Government's property and security interests protected by the statute, and the statute's potential for deterring constitutionally protected speech. Facial invalidation is "strong medicine," *Broadrick v. Oklahoma, supra,* 413 U.S. at 613, 93 S.Ct. 2908, because it necessarily involves the sacrifice of one important interest to further another. In the present case, no such sacrifice is necessary because a narrowing interpretation is possible. In *Arnett v. Kennedy,* 416 U.S. 134, 162, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15 (1974), the Supreme Court rejected an overbreadth challenge to a federal statute that permitted the dismissal of employees "for such cause as will promote the efficiency of the service," by declaring as a general rule that the statute did not apply to constitutionally protected expression. Here, there is also no indication that Congress meant to prohibit constitutionally protected disclosures. But because the statute in this case involves criminal sanctions, the language of the statute must be further defined, and the scope of the statute reduced. The solution is to interpret § 641 alone as neither authorizing nor prohibiting the transfer of particular types of information. The section must be read as merely establishing a penalty for the violation of other, more particular, prohibitions against disclosure. Thus, the jury may consider only transfers of information affirmatively prohibited by other federal statutes, administrative rules and regulations, or, perhaps, longstanding government practices. Because the network of restrictions on the disclosure of government information is complex, no government-wide validation or invalidation of § 641 is possible or appropriate. Constitutional challenges to this statute must be considered on a case-by-case basis in light of the particular type of information involved and the character of the prohibition against disclosure. This does not mean that further review of § 641's chilling effect on First Amendment activities must be restricted to an examination of the government controls "as applied" to the particular defendant. Rather, the various statutes and regulations dealing with confidential government information may still be challenged on their face, but only when relevant; the existence of § 641 will mandate careful scrutiny.[9]

---

**9.** The issues before future courts in § 641 prosecutions involving First Amendment defenses will be numerous. These courts will have to deal with questions such as the right of the jury to consider "custom and usage," rather than explicit statutory or regulatory guidelines, as an affirmative prohibition invoking § 641 sanctions, *cf. Hynes v. Mayor of Oradell,* 425 U.S. 610, 622 n. 6, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439, 754 (1974), and the feasibility of seeking an authoritative interpretation of the particular regulatory prohibition prior to engaging in arguably protected activity, *cf. Buckley v. Valeo,* 424 U.S. 1, 40, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Arnett v. Kennedy,* 416 U.S. 134, 160, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). The myriad constitutional problems involved in another context—the regulation of sensitive defense information, are discussed in Edgar & Schmidt, *The Espionage Statutes and Publication of Defense Information,* 73 Colum. L.Rev. 929 (1973). *See generally M.* Halperin & D. Hoffman, *Freedom v. National Security* (1977).

Justice Department regulations prohibit the improper use of official information that has come to an individual by reason of his status as a Department of Justice employee and which has not become part of the body of public information. 28 C.F.R. § 45.735–10 (1977).[10] The Agents Manual of the Drug Enforcement Administration further particularizes when a disclosure of information is improper. *Cf. Adamian v. Jacobsen*, 523 F.2d 929, 934–35 (9th Cir. 1975). A "breach of integrity" is defined to include "[p]roviding official information to any person known or suspected to be involved in the narcotic or drug traffic . .." § 6123(C). "Official information" includes identification of investigative sources or targets, and the identity of undercover agents. § 6123(C)(1), (2), & (4). Disclosure of information held in the computerized records of the Narcotics and Dangerous Drugs Information System (NADDIS), from which the information in this case was allegedly taken, is subject to a complex set of rules. *See* § 6142.1 *et seq.* The "disclosure of information" is defined as "the release to a non-DOJ [Department of Justice] person or agency of any item of information that includes either the name of an individual or any number or identifying item, such as a finger or voice print, by which the individual may be subsequently identified," and the release of information includes oral disclosures. § 6141.2(C). Disclosure is permitted only under certain conditions, and is generally based on a demonstrated need to know, taking into consideration the needs of law enforcement agencies, other departments, Congress, and the Courts. To the extent relevant, provision is made for disclosures to members of the general public under The Privacy Act, 5 U.S.C. § 552a, and The Freedom of Information Act, 5 U.S.C. § 552. However, an

agent is not authorized to release information to the general public. These rules are specific and carefully constructed to take into consideration the government's interest in law enforcement and the right of various groups to government information. The risk that these rules might interfere with constitutionally protected activity is minimal at best. Therefore these provisions are neither vague nor overbroad on their face.

Accordingly, the motion to dismiss is hereby DENIED.

---

**10.** *See also* 28 C.F.R. § 45.735–13 (1977) (Misuse of official position and coercion); 28 C.F.R. § 45.735–18 (1977) (Conduct prejudicial to the Government). Congress has granted to the heads of the various departments authority to restrict access to government information, 5 U.S.C. § 301, through means consistent with the requirements of the Freedom of Information Act, 5 U.S.C. § 552. The Attorney Gener-

al, in addition to promulgating department-wide regulations, has delegated to division heads the authority to issue supplemental and implementing regulations. 28 C.F.R. § 45.735–28 (1977). At the time of the alleged offenses, defendant Lambert was an employee of the Drug Enforcement Administration in Washington, D. C.