985 F.2d 554
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert M. WOHLFARTH, Defendant-Appellant.
 No. 92-5146.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 29, 1992
Decided: January 26, 1993
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CR-91-402-A)
 W. Neil Eggleston, HOWREY & SIMON, Washington, D.C., for Appellant. Jack I. Hanly, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
 Leiv H. Blad, Jr., HOWREY & SIMON, Washington, D.C., for Appellant.
 Richard Cullen, United States Attorney, Joseph J. Aronica, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 PER CURIAM:
 
 OPINION
 
 1
 Robert M. Wohlfarth appeals from a judgment of conviction following a jury trial in which he was found guilty on Count 2 of a four count indictment. This count charged him with converting or conveying without authority a thing of the United States having a value in excess of $100 in violation of 18 U.S.C. § 641 (1976). He was acquitted on a conspiracy count and on two bribery counts in the same indictment. He seeks reversal and claims (1) thats 641 does not apply to the disclosure of information in this case; (2) that the evidence was not sufficient to convict him under the statute; (3) that the court improperly admitted third party testimony as to the state of his mind; and (4) that the court improperly admitted wiretaps that contained conversations protected by the marital communications privilege.
 
 
 2
 After a careful consideration of the briefs and oral arguments and a thorough examination of the record, we find no error and we affirm.
 
 I.
 
 3
 Wohlfarth is a patent attorney, who worked for the United States Navy in its Strategic Systems Program (SSP). Among his duties was the determination of various patent clauses to be used in procurement contracts. Appellant's wife was the secretary to William Parkin, a private consultant, who advised defense contractors on ways of obtaining Navy contracts. Parkin had formerly worked as a Navy procurement officer. The Navy became suspicious that Parkin was obtaining inside procurement information and a wiretap was placed on his telephone after a proper court order had been obtained. This wiretap revealed that the appellant was involved in furnishing procurement information to Parkin prior to the award of contracts.
 
 
 4
 The procurement leading to the indictment was the purchase of the Pendulous Integrated Gyroscopic Accelerometers, known as 10PIGA, for Trident submarines. The Navy had been obtaining this equipment from Honeywell, and it wished to obtain a second source by use of a competitive procurement. Wohlfarth decided upon the patent clauses to be used in the procurement and in August 1986, SSP issued a Request for Proposals to the industry.
 
 
 5
 On November 3, 1986, several companies, including Litton, Bendix, Rockwell, Ferrente, and Northrop, submitted proposals. These proposals were considered by the government's Technical Proposal Evaluation Panel (TPEP) and the Navy contracting officers.
 
 
 6
 Prior to the award of a contract, government employees are not to release information as to a contractor's bid either to other contractors or to the public. SSP had a standard practice of not releasing the price of any bid prior to the award of a competitive contract, and 48 C.F.R. §§ 5.401 and 15.413-1 (1991), prohibit the release of price information during the procurement process.
 
 
 7
 Following the award of a contract, a losing company is entitled to be debriefed by procurement officers so as to learn where their proposals were weak. However, the procurement officers are not authorized to tell a losing company the prices proposed by other losing companies or the evaluation scores and rankings of the proposals that have been made by TPEP.
 
 
 8
 After the 10-PIGA procurement process had begun, but before any proposals had been submitted, Wohlfarth contacted Northrop's vice president for business development, Robert Ziernicki, and suggested that he hire William Parkin to assist in the procurement. Parkin was retained by Northrop to obtain procurement information, and shortly before the award of the 10-PIGA contract, Parkin contacted Northrop's marketing representative, Sigurski, and using information furnished by Wohlfarth,[1] advised Sigurski that Northrop was about to lose the bid to Litton. Parkin provided the bid prices of all competitors and even related Northrop's bid price, a figure that Sigurski did not previously have. Ziernicki and Sigurski testified that during their 10 years and 25 years, respectively, of seeking procurement contracts, they had never before received competitors' prices during the procurement competition.
 
 
 9
 Parkin advised Sigurski that if Northrop wished to get back into the competition it must immediately send a telegram to SSP stating that its bid was in error and then it must submit a revised bid lower than Litton's. Northrop officials met and determined that they could not reduce their bid by a sufficient amount to compete with the existing Litton proposal, and Parkin was advised that Northrop would not make another bid.
 
 
 10
 Thereafter, Northrop asked Parkin for a written report on the procurement procedure and Parkin obtained from Wohlfarth the price figures of each bidder, the evaluation rankings and scores of the various bids and other source selection information. This information was included in the final written report to Northrop. Parkin was paid $12,500 by Northrop for his services.
 
 
 11
 It was the government's contention that Wohlfarth provided the procurement sensitive information to Parkin on or before December 4, 1986, approximately five days before the contract was awarded or announced.
 
 
 12
 Wohlfarth testified that he had not disclosed any of the price figures to Parkin prior to the award of the 10-PIGA contract, because he knew that such a disclosure was prohibited. Wohlfarth stated that he had told Parkin that Litton had won the contract only after this had been confirmed by the commander of SSP, and he had not spoken with the commander until December 9 or 10, 1986, after the award of the contract. The appellant testified that he had learned the pricing and evaluation scores from listening to conversations at SSP after the award of the contract. He admitted that he had prepared a written report for Parkin to send to Northrop which included this information, but this was after the contract had been awarded. The prices submitted by Litton in its bid were clearly information covered by 48 C.F.R. § 15.413-1(a) and should not have been revealed to Parkin or to Northrop employees. The bid of Litton was "received in confidence from an offeror," it was marked "Source Selection Sensitive for Official Use Only" and was not to be released. See 16 C.F.R. § 5.401(b)(2).[2]
 
 II.
 
 13
 Wohlfarth argues that the § 641 does not apply because United States v. Lambert, 446 F. Supp. 890 (D. Conn. 1978), aff'd sub nom, United States v. Girard, 601 F.2d 69 (2d Cir.), cert. denied, 444 U.S. 871 (1979), held that 18 U.S.C. § 641 does not apply to the disclosure of government information unless such disclosure is prohibited by statute or regulation. This argument is unpersuasive. First, the FARs are regulations that clearly seek to protect the government's interest during the procurement process by preventing the premature release of confidential pricing information. Second, Lambert is not as restrictive as appellant would have us believe. It holds"the jury may consider only transfers of information affirmatively prohibited by other federal statutes, administrative rules and regulations, or, perhaps long standing government practices." 446 F. Supp. at 899.
 
 
 14
 The evidence established not only the language and clear intent of the FARs, but also the longstanding government practice of keeping bid information confidential during the procurement process so as to protect the government from collusive bidding. The information alleged to have been disclosed by Wohlfarth was clearly within the reach of 18 U.S.C. § 641. The FARs prohibited his disclosing Litton's bid price to Parkin, the evidence established SSP's practice of prohibiting disclosure of such information, and Wohlfarth testified that he was aware that he was not authorized to disclose this information prior to the award of the contract. We held in United States v. Fowler, 932 F.2d 306, 310 (4th Cir. 1991), that " § 641 would apply because information is a species of property and a thing of value." The information as to competitive bids is a thing of considerable value to the United States and to competing companies. This information is protected by regulations and by longstanding government practice and 18 U.S.C. § 641 applies.
 
 III.
 
 15
 Appellant challenges the sufficiency of the evidence to sustain his conviction. He argues that the government's case"was animated by a single theory: that on December 4, 1986, Wohlfarth disclosed procurement sensitive information to Parkin, who then relayed that information to Northrop officials." He then attacks this theory with the argument that the evidence was undisputed that he was not in Washington during the entire week of December 1, 1986, and he had no access to nor the ability to disclose the information.
 
 
 16
 The evidence does reflect that Wohlfarth was working at a Navy installation in San Jose, California from Monday, December 1, 1986 through Friday, December 5, 1986.
 
 
 17
 Wolfarth also argues that the government's witness Parkin testified that Wohlfarth had only disclosed to him the facts that Litton had won the contract and that the contract would be awarded without conducting a BAFO (best and final offer) and that this information was not disclosed by Wohlfarth to Parkin until after the award of the 10-PIGA contract had been announced. Therefore, the information was no longer procurement sensitive.
 
 
 18
 In United States v. Tresvant, 677 F.2d 1018 (4th Cir. 1982), we set forth the principles that control when we review a claim of insufficiency of the evidence:
 
 
 19
 The guidelines for reviewing the sufficiency of evidence to support a conviction are quite familiar. The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. United States v. Shaver, 651 F.2d 236, 238 (4th Cir. 1981), citing Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); United States v. Sherman, 421 F.2d 198, 199-200 (4th Cir.), cert. denied, 398 U.S. 914, 90 S. Ct. 1717, 26 L. Ed. 2d 78 (1970). We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established. Holloway v. McElroy, 632 F.2d 605, 641 (5th Cir. 1980), cert. denied, 451 U.S. 1028, 101 S. Ct. 3019, 69 L. Ed. 2d 398 (1981); United States v. Grow, 394 F.2d 182, 201 (4th Cir.), cert. denied, 393 U.S. 840, 89 S. Ct. 118, 21 L. Ed. 2d 111 (1968). Where there are conflicts in the testimony, it is for the jury and not the appellate court to weigh the evidence and judge the credibility of the witnesses. United States v. Fisher, 484 F.2d 868, 869-70 (4th Cir. 1973), cert. denied, 415 U.S. 924, 94 S. Ct. 1428, 39 L. Ed. 2d 480 (1974). (Emphasis in original.)
 
 
 20
 Id. at 1021.
 
 
 21
 Applying these principles to the evidence in the record, we find that there was sufficient evidence to support the verdict of guilty as to Count 2.
 
 
 22
 The government's position was that the procurement sensitive information was disclosed by Wohlfarth to Parkin, and then passed by Parkin to Sigurski of Northrop, and that this disclosure occurred prior to December 9, 1986, the date of the announcement of the 10-PIGA contract award. The date of the unauthorized disclosure as alleged in the indictment to be "on or about December 4, 1986."
 
 
 23
 Sigurski testified that prior to the award of the contract, Parkin called him and advised that the bid was accelerated and was to be awarded without the usual BAFO. Parkin also told Sigurski the amount of Litton's bid and the amount of Northrop's bid (a figure of which Sigurski was unaware, even though he was an employee of Northrop). Parkin advised that if Northrop wanted to stay in the bidding, it must immediately wire SSP that there had been an error in its bid and ask for additional time to submit a new or corrected bid, which must be lower than Litton's bid of approximately $22 million. Sigurski passed this information on to other Northrop officials. He testified that the following day Parkin called to find out if Northrop was going to make another bid, and Sigurski advised that there had been no decision. A day or so later, still prior to the award of the contract, Sigurski advised Parkin that Northrop would not submit a new bid, because it could not reduce its price sufficiently to be competitive with Litton.
 
 
 24
 Parkin testified that all information he disclosed to Sigurski about the 10-PIGA procurement had come from Wohlfarth, but that this information had not been given to Sigurski prior to the award of the contract. After the contract had been awarded, Parkin made a written report to Northrop explaining what had happened in the procurement. This report contained the price figures of all five bidders, and Wohlfarth admitted that he furnished this information to Parkin, but he claimed that this occurred only after the contract had been awarded and the material was no longer procurement sensitive. A jury may believe a part of a witness' testimony and disbelieve the remainder. It could believe Parkin's and Wohlfarth's testimony as to the type of information conveyed but disbelieve them as to the date. Sigurski's testimony was sufficient to establish the date of December 4, 1986.
 
 
 25
 Although Wohlfarth was not in his Washington office during the week of December 1, 1986, this would not foreclose a jury from finding that he had access to the information at an earlier date or that he received the information by telephone while he was in California and passed it along to Parkin. Contracting officer Wright testified that the pricing information was on his desk in November 1986 and that Wohlfarth could have seen it then. Wohlfarth could have learned of the bid prices from general conversations at SSP, because he testified that this is how he obtained the pricing and evaluation data after his return from California.
 
 
 26
 The testimony was clear that Northrop had the procurement sensitive information several days prior to the award of the contract. Sigurski testified that this information came to him from Parkin and from no other. Parkin testified that his information about 10-PIGA came only from Wohlfarth, although Parkin denied receipt of this information prior to December 9, 1986. There was ample proof that procurement sensitive information was released by Wohlfarth, and there was sufficient circumstantial evidence for a jury to find that it was released by appellant on or about December 4, 1986.
 
 IV.
 
 27
 We find no merit to appellant's exceptions relating to the jury instructions. First, he complains that the judge instructed the jury that the information contained in Count 2 of the indictment was a thing of value that could be converted or conveyed without authority. He asserts that this was an issue that should have been left to the jury. In United States v. Fowler, supra, we held that § 641 applied to information because it is property and a thing of value. In the present case, the court instructed the jury that the procurement information pertained to the 10-PIGA contract, and that the government had to prove beyond a reasonable doubt that the appellant had conveyed information relating to this procurement without authority. The issue was not whether the information was procurement sensitive, or even whether appellant had released it. The issue for the jury was whether appellant had released this information prior to December 9, 1986. The jury was properly instructed on the essential elements of the crime.
 
 
 28
 Appellant also contends that the court erred in declining to give a good faith instruction, but this was not necessary. The court instructed the jury that the defendant had to act knowingly and willfully, and there was no contention by either party that Wohlfarth acted in good faith in releasing the information prior to the date of the contract award. Wohlfarth testified that he did not release it prior to this date, so good faith is not relevant.
 
 V.
 
 29
 Appellant contends that the court-approved wiretap contained marital communication between himself and his wife and that these communications were privileged. However, he does not contend that the excerpts of conversations played during the trial contained privileged communications, but argues that the government's failure to minimize the interception of some of the privileged communications during the course of the wiretaps required suppression of all of the recorded conversations between Mr. and Mrs. Wohlfarth. The district court conducted a hearing as to how the wiretap interceptions were conducted and what efforts were made to minimize the interception of communications not subject to the court order. We find no abuse of discretion by the district court in the admission of the taped conversations which were played for the jury, and we find no abuse of discretion in the district court's refusal to suppress all of the conversations between the Wohlfarths. It must be remembered that although these were conversations between husband and wife, Mrs. Wohlfarth was employed as Parkin's secretary, and was, on the occasions used at trial, conversing with Wohlfarth as Parkin's secretary and not as Wohlfarth's wife.
 
 VI.
 
 30
 Appellant claims error in the admission of contracting officer Wright's testimony relating to standard practices of SSP in not disclosing competitor's prices to other competitors or to the public prior to the award of a contract, in not disclosing the evaluation scores and bids of losing companies after the award of a contract, and Wright's opinion that Wohlfarth would have known of these practices. Appellant contends that this is mere speculation and violates Federal Rule of Evidence 701 because it does not represent the witness' perception. A review of Wright's testimony clearly establishes that his opinion was based on his perceptions. He had been employed in Naval procurement with SSP for more than 15 years. He was familiar with the 10-PIGA procurement, the competitive procedures used by SSP and the standard practices used to protect the integrity of the procurement process. He was also familiar with the work normally done by the appellant and had worked with him on the 10-PIGA procurement. Based on this knowledge, Wright had a rational basis for his opinion that Wohlfarth knew of the standard practice not to release information regarding bid prices prior to the award of the contract.
 
 
 31
 For the reasons set forth above, the judgment of conviction is
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Both Parkin and Wohlfarth testified that this information was not furnished until after the date the contract had been awarded, but there was evidence from which the jury could conclude that such information was passed before such award
 
 
 [2]
 48 C.F.R. § 5.401 (1986)
 
 
 [5]
 401 General
 (a) A high level of business security must be maintained in order to preserve the integrity of the acquisition process. When it is necessary to obtain information from potential contractors and others outside the Government for use in preparing Government estimates, contracting officers shall ensure that the information is not publicized or discussed with potential contractors.
 (b) Contracting officers may make available maximum information to the public, except information -
 (1) On plans that would provide undue or discriminatory advantage to private or personal interests;
 (2) Received in confidence from an offeror;
 (3) Otherwise requiring protection under Freedom of Information Act (see subpart 24.2) or Privacy Act (see subpart 24.1); or
 (4) Pertaining to internal agency communications (e.g., technical reviews, contracting authority or other reasons, or recommendations referring thereto).
 (c) This policy applies to all Government personnel who participate directly or indirectly in any stage of the acquisition cycle.